CA20- 123

## Foreclosure Loss Summary

The lender may lose an estimated $93,075 if they move forward with foreclosure proceedings against the property, according to the summary estimate below.

| Foreclosure Losses | |
|---|---|
| Value of property: | $478,988 |
| Amount of loan: | $478,988 |
| Cost of legal action: | $1,800 |
| # of months to foreclose: | 0 |
| Loss of income during foreclosure: | $10,000 |
| Clean-up costs: | $1,000 |
| Insurance coverage: | $200 |
| Property taxes not paid: | $2,000 |
| Discount off value for quick sale: | 10% |
| Selling costs: | 7% |
| Sales price: | $431,089 |
| Net after sales costs: | $400,913 |
| Loss to lender | -$93,075 |

# Forensic Loan Analysis Report

## Lucien M. Spino & Donna M. Spino

### 16 Red Chimney Drive, Lincoln RI 02865

# Table of Contents

| Section Title | Page |
|---|---|
| Forensic Audit | 3 |
| Anti-Predatory Lending Violations | 4 |
| Forensic Examination | 6 |
| Forensic Examination Findings | 7 |
| Missing Documents | 8 |
| Mortgage Void/Cancellation | 9 |
| Law Summary | 11 |

**Forensic Audit focuses on Violations of**

**(TILA) Truth In Lending,(RESPA) Real Estate Procedures Acts, and (FDCPA) Fair Debt Collection Practices Act.**

1. A Forensic Loan Audit is an audit on loan documentation to uncover violations and errors. It is an extensive comprehensive review and investigation into the Homeowners/borrowers existing loan.

**The main types of violations are as follows;**

- ❖ Good Faith Guideline Violations.
- ❖ Borrower approved for loan they are not able to repay.
- ❖ Real Estate Procedures Acts Violations
- ❖ No Net Benefit to Borrower.
- ❖ Truth-In-Lending Act (TILA) Violations Inaccurate reporting of APR and finance charge calculations on borrower disclosures. Calculation errors which occur as a direct result of failing to include one or more prepaid finance charges in the calculations, incorrect disclosed funding dates, or last-minute changes made to loan by the settlement agent at the closing table. If it is understated, the lender is in violation of the federal Truth-In-Lending Act as well as many state laws prohibiting such actions. Lender is required to reimburse borrower for the difference, and may be subject to statutory damages, administrative sanctions, loan buy-backs, and lawsuits. In addition, the rescission period may reopen, creating additional risk for the lender.

## Anti-Predatory Lending Violations

**These are relating to Consumer Protection laws;**

- ❖ Violations usually occur because of the misunderstanding of how they work. Examples of violations include failing to include fees such as yield spread premiums in the calculations or using an incorrect loan amount value to perform the calculation. Penalties vary by each law. The usual costs include borrower reimbursements, statutory and punitive damages, attorneys' fees, administrative fines and penalties, loan buy-backs and reformation, and class-action lawsuits.

### State Law Violations;

- ❖ Examples include illegal prepayment penalty clauses, rates that are usurious, or fees that are not allowed to be charged. Some penalties include actual damages and costs, attorney's fees, administrative fines and penalties, loan buy-backs, and class-action lawsuits.

- ❖ Reverse Mortgage Violations -These violations include violations relating to reverse mortgage obtained. Some violations include failing to disclose the APR, and providing incomplete or improper disclosures.

- ❖ Real Estate Settlement Procedures Act (RESPA) Violations-RESPA prohibitions put limits on a lender's and broker's ability to charge or pay fees that are hidden from the borrower. Violations include accepting kickbacks or referral fees, up charging for services provided by 3rd parties, and charging for services not performed.

- ❖ Penalties include actual damages, administrative fines and class-action lawsuits.

- ❖ In addition, other violations include lending without providing borrowers a reasonable, tangible net benefit, state-specific disclosure errors, servicing violations, and Fair Lending violations.

  If there is one of these types of violations in the loan audit discovered, it could result in some cases repayment of interest back to the borrower/homeowner.

### Constructive Fraud

- ❖ Material facts relating to the loan, which include terms of the loan. Prepayment penalty or any information which a borrower must know before loan is accepted? Were these facts not properly disclosed to the borrower? Were they mentioned at all?

### Fraud and Negligent Misrepresentation

❖ This is basically any statements comments and representation written or oral by the broker, loan officer, notary which in any way contradicted the terms of the loan documents.

### Negligent Misrepresentation

❖ If the broker/loan officers who worked on the loan make errors which result in misrepresentation, this is classified as negligent misrepresentation.

### Breach of Contract

❖ Any terms in the contract of the note the lender failed to follow, such as the way the interest is calculated and the penalties.

## Forensic Examination

2. This loan application has been audited for the purpose of determining violations of Truth in Lending Act [16 U.S.C. § 1601] ("TILA"), Home Ownership Equity Protection Act [12 C.F.R. 226.32 et seq.] ("HOEPA"), Real Estate Settlement Procedures Act [12 U.S.C. § 2601], and to the extent applicable, violations of other state and federal laws, certain predatory lending practices, and compliance issues.

3. As is standard practice for the process of forensic auditing, this report is based solely on the documentation provided by the borrower requesting my services. The borrower understands that I am required to make reasonable and industry knowledgeable assumptions as to provide disclosures, loan terms, and compliance dates that, if erroneous, may result in differences between my findings and the documents' actual compliance with regulatory requirements.

4. Specific analytical tests were used to determine compliance with various federal regulations including the Real Estate Settlement Procedures Act (RESPA), Truth in Lending Act (TILA), Home Ownership and Equity Protection Act (HOEPA) and Regulation Z. These tests included: a) the reverse engineering and calculation of all required TILA disclosure variables; b) a detailed analysis and review of all loan variables and features; c) an assessment of HOEPA and other disclosure requirements; d) analysis and correct computation of the rescission period; and e) a detailed examination of HUD-1 closing costs. A TILA payment schedule was also prepared with a detailed list of loan terms for informational purposes. For all sections, "NA" indicates that the value, variable or result is not applicable or not available.

# Single Family Home

**Type of Report:** Forensic Mortgage Analysis

**Prepared for:** Lucien M. Spino & Donna M. Spino

**Loan Amount:** $478,988

**Loan Date:** On or about October 1, 2007

## Forensic Examination Findings

### Good Faith Estimate and Truth in Lending Statement

5. The Truth In Lending Act states that an initial disclosure is to be issued within three (3) working or business days from the receipt of the loan application. In addition, inclusions, exclusions, and applicable changes to the terms of loan or program must be provided within three (3) working or business days.

6. The Real Estate Settlement Practices Act (RESPA) of 1974 is a response by Congress to perceived abuses in the real estate settlement process. It is an attempt to protect consumer(s) from unnecessarily high settlement charges resulting from certain abuses.

7. RESPA's stated purpose is to bring about specific changes in the agreed or proposed settlement process for residential real estate. Results of this act are as follows:

❖ More accurate and effective advance disclosure of settlement costs to home buyers and to home sellers removal of or elimination of kickbacks and/or referral fees that had a tendency to unnecessarily increase certain settlement service costs.

❖ Reduced Amounts to home buyers to be placed in escrow accounts established to ensure the payment of real estate taxes and insurance fees.

❖ Significant reformation and modernization of local land title record keeping (12 U.S.C.A § 2601)

8. The Real Estate Settlement Practices Act of 1974 is in governance and applies to any "federally related mortgage loan" (excluding loans for temporary financing such as a construction loan that is secured by a first or subordinate lien on residential property, including individual units of condominiums and cooperatives) 12 U.S.C.A. § 2602(1) (A). It also applies to any whole or partial loans by any lender with deposits or accounts that are insured by a federal agency and/or a lender that is regulated by the federal government 12 U.S.C.A. § 2602(1) (B) (i).

# Missing Documents

**File is missing initial and final disclosure documents, including but not limited to:**

**Per RESPA (Real Estate Settlement Procedures Act- 12 USC 2601 et seq.)**

- ❖ Affiliated Business Arrangement Disclosure
- ❖ Servicing Disclosure Statement
- ❖ Escrow Account Disclosure

**Per ECOA (Equal Credit Opportunity Act- Reg B - 12 CFR 202):**

- ❖ Initial signed & dated Uniform Residential Loan Application (1003)

**Per FCRA (Fair Credit Reporting Act- 15 USC 1681):**

- ❖ Disclosure of Credit Scores
- ❖ Notice to Home Loan Applicant

9. As per both state and federal laws that are mandated for initial disclosures, we noted below that initial disclosure documentation was not found nor provided nor included in this file.

10. If the broker failed to deliver that initial disclosure to the borrower, and then it becomes incumbent for the lender to ensure and confirm that these disclosures were delivered to the borrower on time. If the lender failed to provide these disclosure documents to the borrower within three (3) working or business days for the original date of loan application, then the borrower must complete a sworn statement testifying to that effect.

## Right of Recession/Right to Rescind Mortgage

***Notice Of Right To Cancel*** TILA (***Truth In Lending Act, 15 USC Section 1601 et seq; 12 CFR Part 266***) allows three (3) days to review Disclosure Documents. The referenced "Three Day Right To Cancel" must have a trigger to begin. That trigger is, when the Lender has provided the Borrower with **ALL** of the required Disclosures under ***TILA***, and that the same are true, complete, accurate, and timely provided.

Being as the entire loan/mortgage process and Mortgage Note referenced herein and throughout, was obtained by wrongful acts of fraud, fraudulent inducement, concealment and fraudulent misrepresentation, the Borrower has other recourse, right, and cause of action under numerous State and Federal statutes.

**Pursuant to the United State Supreme Court's decision in Jesinoski v. Countrywide Home Loans, Inc. (2015), 135 S.Ct. 790, TILA gives me, as a borrower, the right to rescind the subject loan until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under TILA. I am hereby notifying you, as the creditor, of my intention to do so as you and/or your predecessors have failed to satisfy the TILA disclosure requirements, including but not limited to delivery of a written document to me explaining my rights at the time of the transaction.**

To this date, Lender has **never** provided Borrower with true, complete, accurate or timely documents as required. **ONLY AFTER** such provision has been complied with can the "**3 DAY RIGHT TO CANCEL**" period begin. If the required full Disclosures have not been provided, then the period in which to CANCEL is extended for up to three (3) years, or until Lender moves to foreclose. The records thus far evidence that Borrower has requested to cancel within the three (3) year stipulated time period, while still waiting to receive all truth-in-lending disclosures as required by Federal Law, the same of which has never been received.

A close perusal, and audit of Borrower's note/loan documents have revealed certain Disclosure Violations, and that the Borrower has the remedial right and remedy pursuant to ***UCC 1-201 (32) (34)***, inter alia, to invoke their Right Of Rescission (ROR), as further evidenced by the original **NOTICE OF RIGHT TO CANCEL**. This letter shall constitute **NOTICE** to all Lender(s), Successor(s), and Beneficiaries assigned, and/or appointed.

After sufficient **NOTICE** has been given to Lender, the Lender is required by Federal Law to CANCEL any lien(s), and to CANCEL any security interest on the Borrower's property within twenty (20) days. The Lender must also return any money, interest, fee, and/or property to the Borrower, as well as any money/funds given to any person or fiction in law/entity in connection with said transaction.

In accordance with both State and Federal law or until Lender complies, Borrower may retain the proceeds of the transaction. If it should be "impractical", or "Unfair" for the Borrower to return the property when gross discrepancies, fraud, or other wrongful acts are discovered, then he/she/they may offer its "Reasonable Value".

In the event that the Lender should fail, or refuse to return the Borrower's money offer within twenty (20) days, the Borrower may then regain/acquire all rights to clear title and reconveyance under *Federal law*, *State Statutes*, *Uniform Commercial Code*, and provisions of *TILA*, with the same being supported by the evidence of both public and bank records, and further as attached hereto.

Additionally, Borrower has the right to offer Lender a Reasonable Value. However, the penalties a bank can face for violations of *TILA*, and other State and Federal law can be as much as triple the damages, i.e., triple the amount of the interest the bank stood to fraudulently make off the mortgage/loan transaction. Therefore, the Borrower(s) hereby in good faith makes the following offer: Borrower will forgive Bank/Lender any liability incurred by its wrongful actions, provided Bank/Lender rightfully forgive Borrower(s) the full amount of mortgage/credit the Bank/Lender fraudulently alleged to have given. In addition, Borrower(s) make the one time demand $1, 250,000.00 for any loss, damage, and injury he/she/they have sustained; and that Bank/Lender also immediately remove any/all negative comments on Borrower's credit report attributed to this transaction.

Any default, failures, or non-compliance on the Lender's part to perform as herein directed within twenty (20) days of receipt, shall constitute this **NOTICE OF RIGHT TO CANCEL** as valid and fully agreed/accepted pursuant to the terms and conditions as set forth herein.

**Law Summary and Additional Information Section**
**Real Estate Settlement Procedure Act Law(Respa).**

**§ 3500.6   Special information booklet at time of loan application.**

(a) *Lender to provide special information booklet.* Subject to the exceptions set forth in this paragraph, the lender shall provide a copy of the special information booklet to a person from whom the lender receives, or for whom the lender prepares, a written application for a federally related mortgage loan. When two or more persons apply together for a loan, the lender is in compliance if the lender provides a copy of the booklet to one of the persons applying.

(1) The lender shall provide the special information booklet by delivering it or placing it in the mail to the applicant not later than three business days (as that term is defined in §3500.2) after the application is received or prepared. However, if the lender denies the borrower's application for credit before the end of the three-business-day period, then the lender need not provide the booklet to the borrower. If a borrower uses a mortgage broker, the mortgage broker shall distribute the special information booklet and the lender need not do so. The intent of this provision is that the applicant receive the special information booklet at the earliest possible date.

(2) In the case of a federally related mortgage loan involving an open-ended credit plan, as defined in §226.2(a)(20) of Regulation Z (12 CFR), a lender or mortgage broker that provides the borrower with a copy of the brochure entitled "When Your Home is On the Line: What You Should Know About Home Equity Lines of Credit", or any successor brochure issued by the Board of Governors of the Federal Reserve System, is deemed to be in compliance with this section.

(3) In the categories of transactions set forth at the end of this paragraph, the lender or mortgage broker does not have to provide the booklet to the borrower. Under the authority of section 19(a) of RESPA (12 U.S.C. 2617(a)), the Secretary may issue a revised or separate special information booklet that deals with these transactions, or the Secretary may chose to endorse the forms or booklets of other Federal agencies. In such an event, the requirements for delivery by lenders and the availability of the booklet or alternate materials for these transactions will be set forth in a Notice in the Federal Register. This paragraph shall apply to the following transactions:

(i) Refinancing transactions;

(ii) Closed-end loans, as defined in 12 CFR 226.2(a)(10) of Regulation Z, when the lender takes a subordinate lien;

(iii) Reverse mortgages; and

(iv) Any other federally related mortgage loan whose purpose is not the purchase of a 1- to 4-family residential property.

(b) *Revision.* The Secretary may from time to time revise the special information booklet by publishing a notice in the Federal Register.

(c) *Reproduction.* The special information booklet may be reproduced in any form, provided that no change is made other than as provided under paragraph (d) of this section. The special information booklet may not be made a part of a larger document for purposes of distribution under RESPA and this section. Any color, size and quality of paper, type of print, and method of reproduction may be used so

long as the booklet is clearly legible.

(d) *Permissible changes.* (1) No changes to, deletions from, or additions to the special information booklet currently prescribed by the Secretary shall be made other than those specified in this paragraph (d) or any others approved in writing by the Secretary. A request to the Secretary for approval of any changes shall be submitted in writing to the address indicated in §3500.3, stating the reasons why the applicant believes such changes, deletions or additions are necessary.

(2) The cover of the booklet may be in any form and may contain any drawings, pictures or artwork, provided that the words "settlement costs" are used in the title. Names, addresses and telephone numbers of the lender or others and similar information may appear on the cover, but no discussion of the matters covered in the booklet shall appear on the cover.

(3) The special information booklet may be translated into languages other than English.

Truth In Lending (TILA)
Regulation Z

Regulation Z (12 CFR 226) implements the Truth in Lending Act (TILA) (15 USC 1601 et seq.), which was enacted in 1968 as title I of the Consumer Credit Protection Act (Pub. L. 90-321). Since its implementation, the regulation has been amended many times to incorporate changes to the TILA or to address changes in the consumer credit marketplace.

During the 1980s, Regulation Z was changed significantly, first in connection with the Truth in Lending Simplification and Reform Act of 1980. In 1981, all consumer leasing provisions in the regulation were transferred to the Board's Regulation M. During the late 1980s, Regulation Z was amended to implement the rate limitations for home-secured loans set forth in section 1204 of the Competitive Equality Banking Act of 1987 and to require disclosures for adjustable-rate mortgage loans. Other Regulation Z amendments implemented the Fair Credit and Charge Card Disclosure Act of 1988 and the Home Equity Loan Consumer Protection Act of 1988, which required disclosure of key terms at the time of application.

Purpose of the TILA and Regulation Z

The Truth in Lending Act is intended to ensure that credit terms are disclosed in a meaningful way so that consumers can compare credit terms more readily and more knowledgeably. Before its enactment, consumers were faced with a vast array of credit terms and rates. It was difficult to compare loans because the terms and rates were seldom presented in the same format. Now, all creditors must use the same credit terminology and expressions of rates. In addition to providing a uniform system for disclosures, the act is designed to

- Protect consumers from inaccurate and unfair credit billing and credit card practices
- Provide consumers with rescission rights
- Provide for rate caps on certain dwelling-secured loans
- Impose limitations on home equity lines of credit and certain closed-end home mortgages

Determination of the
Finance Charge and the APR

Finance Charge (Open-End and Closed-End Credit) (§ 226.4)

The *finance charge* is a measure of the cost of consumer credit represented in dollars and cents. Along with APR disclosures, the disclosure of the finance charge is central to the uniform credit cost disclosure

)

envisioned by the TILA.

Generally, the finance charge includes any charges or fees payable directly or indirectly by the consumer and imposed directly or indirectly by the financial institution either incident to or as a condition of an extension of consumer credit. For example, the finance charge on a loan always includes any interest charges and, often, other charges, such as points, transaction fees, or service fees.

Regulation Z provides examples, applicable to both open-end and closed-end credit transactions, of what must, must not, or need not be included in the disclosed finance charge (section 226.4(b)).

*Calculation of the Finance Charge (Closed-End Credit)*

One of the more complex tasks under Regulation Z is determining whether a charge associated with an extension of credit must be included in, or excluded from, the disclosed finance charge. The finance charge initially includes any charge that is, or will be, connected with a specific loan. Charges imposed by third parties are finance charges if the institution requires use of the third party. Charges imposed by settlement or closing agents are finance charges if the institution requires the specific service that gave rise to the charge and the charge is not otherwise excluded.

The "Finance Charges" diagram summarizes included and excluded charges and may be helpful in determining whether a loan-related charge is a finance charge.

**§ 226.4 Finance charge.**

(a) *Definition.* The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

(1) *Charges by third parties.* The finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:

(i)  Requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or

(ii)  Retains a portion of the third-party charge, to the extent of the portion retained.

(2) *Special rule; closing agent charges.* Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor--

(i)  Requires the particular services for which the consumer is charged;

(ii)  Requires the imposition of the charge; or

(iii)  Retains a portion of the third-party charge, to the extent of the portion retained.

(3) *Special rule; mortgage broker fees.* Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

(b) *Examples of finance charges.* The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

(1)  Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.

(2)  Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account to the extent that the charge exceeds the charge for a similar account without a credit feature.

(3)  Points, loan fees, assumption fees, finder's fees, and similar charges.

(4)  Appraisal, investigation, and credit report fees.

(5)  Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.

(6)  Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

(7)  Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.

(8)  Premiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.

(9)  Discounts for the purpose of inducing payment by a means other than the use of credit.

(10)  Charges or premiums paid for debt cancellation or debt suspension coverage written in connection with a credit transaction, whether or not the coverage is insurance under applicable law.

(c)  *Charges excluded from the finance charge.* The following charges are not finance charges:

(1)  Application fees charged to all applicants for credit, whether or not credit is actually extended.

(2)  Charges for actual unanticipated late payment, for exceeding a credit limit, or for delinquency, default, or a similar occurrence.

(3)  Charges imposed by a financial institution for paying items that overdraw an account, unless the payment of such items and the imposition of the charge were previously agreed upon in writing.

(4)  Fees charged for participation in a credit plan, whether assessed on an annual or other periodic basis.

(5)  Seller's points.

(6)  Interest forfeited as a result of an interest reduction required by law on a time deposit used as security for an extension of credit.

(7)  *Real-estate related fees.* The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:

(i)  Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii)  Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii)  Notary and credit-report fees.

(iv)  Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest-infestation or flood-hazard determinations.

(v)  Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

(8)  Discounts offered to induce payment for a purchase by cash, check, or other means, as provided in section 167(b) of the Act.

(d)  *Insurance and debt cancellation and debt suspension coverage.* (1) *Voluntary credit insurance premiums.* Premiums for credit life, accident, health, or loss-of-income insurance may be excluded from the finance charge if the following conditions are met:

(i)  The insurance coverage is not required by the creditor, and this fact is disclosed in writing.

(ii)  The premium for the initial term of insurance coverage is disclosed in writing. If the term of insurance is less than the term of the transaction, the term of insurance also shall be disclosed. The premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.

(iii)  The consumer signs or initials an affirmative written request for the insurance after receiving the disclosures specified in this paragraph, except as provided in paragraph (d)(4) of this section. Any consumer in the transaction may sign or initial the request.

(2)  *Property insurance premiums.* Premiums for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, including single interest insurance if the insurer waives all right of subrogation against the consumer,[5] may be excluded from the finance charge if the following conditions are met:

(i)  The insurance coverage may be obtained from a person of the consumer's choice,[6] and this fact is disclosed. (A creditor may reserve the right to refuse to accept, for reasonable cause, an insurer offered by the consumer.)

(ii)  If the coverage is obtained from or through the creditor, the premium for the initial term of insurance coverage shall be disclosed. If the term of insurance is less than the term of the transaction, the term of insurance shall also be disclosed. The premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.

(3)  *Voluntary debt cancellation or debt suspension fees.* Charges or premiums paid for debt cancellation coverage for amounts exceeding the value of the collateral securing the obligation or for debt cancellation or debt suspension coverage in the event of the loss of life, health, or income or in case of accident may be excluded from the finance charge, whether or not the coverage is insurance, if the following conditions are met:

(i)  The debt cancellation or debt suspension agreement or coverage is not required by the creditor, and this fact is disclosed in writing;

(ii)  The fee or premium for the initial term of coverage is disclosed in writing. If the term of coverage is less than the term of the credit transaction, the term of coverage also shall be disclosed. The fee or premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit

transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving a debt cancellation agreement that limits the total amount of indebtedness subject to coverage;

(iii)  The following are disclosed, as applicable, for debt suspension coverage: That the obligation to pay loan principal and interest is only suspended, and that interest will continue to accrue during the period of suspension.

(iv)  The consumer signs or initials an affirmative written request for coverage after receiving the disclosures specified in this paragraph, except as provided in paragraph (d)(4) of this section. Any consumer in the transaction may sign or initial the request.

(4)  *Telephone purchases.* If a consumer purchases credit insurance or debt cancellation or debt suspension coverage for an open-end (not home-secured) plan by telephone, the creditor must make the disclosures under paragraphs (d)(1)(i) and (ii) or (d)(3)(i) through (iii) of this section, as applicable, orally. In such a case, the creditor shall:

(i)  Maintain evidence that the consumer, after being provided the disclosures orally, affirmatively elected to purchase the insurance or coverage; and

(ii)  Mail the disclosures under paragraphs (d)(1)(i) and (ii) or (d)(3)(i) through (iii) of this section, as applicable, within three business days after the telephone purchase.

(e)  *Certain security interest charges.* If itemized and disclosed, the following charges may be excluded from the finance charge:

(1)  Taxes and fees prescribed by law that actually are or will be paid to public officials for determining the existence of or for perfecting, releasing, or satisfying a security interest.

(2)  The premium for insurance in lieu of perfecting a security interest to the extent that the premium does not exceed the fees described in paragraph (e)(1) of this section that otherwise would be payable.

(3)  *Taxes on security instruments.* Any tax levied on security instruments or on documents evidencing indebtedness if the payment of such taxes is a requirement for recording the instrument securing the evidence of indebtedness.

(f)  *Prohibited offsets.* Interest, dividends, or other income received or to be received by the consumer on deposits or investments shall not be deducted in computing the finance charge.

*[Source: 75 Fed. Reg. 7794, Feb. 22, 2010]*

Continue HERE

Right of Rescission

**§ 226.15 Right of rescission.**

(a) *Consumer's right to rescind.* (1)(i) Except as provided in paragraph (a)(1)(ii) of this section, in a credit plan in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind: each credit extension made under the plan; the plan when the plan is opened; a security interest when added or increased to secure an existing plan; and the increase when a credit limit on the plan is increased.

(ii)  As provided in section 125(e) of the Act, the consumer does not have the right to rescind each credit extension made under the plan if such extension is made in accordance with a previously established credit limit for the plan.

(2)  To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication. Notice is considered given when mailed, or when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3)  The consumer may exercise the right to rescind until midnight of the third business day following the occurrence described in paragraph (a)(1) of this section that gave rise to the right of rescission, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[36] whichever occurs last. If the required notice and material disclosures are not delivered, the right to rescind shall expire 3 years after the occurrence giving rise to the right of rescission, or upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.

(4)  When more than one consumer has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b)  *Notice of right to rescind.* In any transaction or occurrence subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered in electronic form in accordance with the consumer consent and other applicable provisions of the E-Sign Act). The notice shall identify the transaction or occurrence and clearly and conspicuously disclose the following:

(1)  The retention or acquisition of a security interest in the consumer's principal dwelling.

(2)  The consumer's right to rescind, as described in paragraph (a)(1) of this section.

(3)  How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4)  The effects of rescission, as described in paragraph (d) of this section.

(5)  The date the rescission period expires.

(c)  *Delay of creditor's performance.* Unless a consumer waives the right to rescind under paragraph (e) of this section, no money shall be disbursed other than in escrow, no services shall be performed, and no materials delivered until after the rescission period has expired and the creditor is reasonably satisfied that the consumer has not rescinded. A creditor does not violate this section if a third party with no knowledge of the event activating the rescission right does not delay in providing materials or services, as long as the debt incurred for those materials or services is not secured by the property subject to rescission.

(d)  *Effects of rescission.* (1) When a consumer rescinds a transaction, the security interest giving rise to

the right of rescission becomes void, and the consumer shall not be liable for any amount, including any finance charge.

(2)  Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3)  If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4)  The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

(e)  *Consumer's waiver of right to rescind.* (1) The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all the consumers entitled to rescind. Printed forms for this purpose are prohibited, except as provided in paragraph (e)(2) of this section.

(2)  The need of the consumer to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during June through September 1993, pursuant to 42 U.S.C. 5170, to be a major disaster area because of severe storms and flooding in the Midwest.[36a] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

(3)  The consumer's need to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during June through September 1994 to be a major disaster area, pursuant to 42 U.S.C. 5170, because of severe storms and flooding in the South.[36b] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

(4)  The consumer's need to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during October 1994 to be a major disaster area, pursuant to 42 U.S.C. 5170, because of severe storms and flooding in Texas.[36c] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

(f)  *Exempt transactions.* The right to rescind does not apply to the following:

(1)  A residential mortgage transaction.

(2)  A credit plan in which a state agency is a creditor.

*[Reg. Z, 46 FR 20892, Apr. 7, 1981, as amended at 54 FR 24688, June 9, 1989; 58 FR 40583, July 29, 1993; 59 FR 40204, Aug. 5, 1994; 59 FR 63715, Dec. 9, 1994; 66 FR 17338, Mar. 30, 2001; 72 FR 63474, Nov. 9,*

*2007]*

## § 226.22 Determination of annual percentage rate.

(a) *Accuracy of annual percentage rate.* (1) The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made. The annual percentage rate shall be determined in accordance with either the actuarial method or the United States Rule method. Explanations, equations and instructions for determining the annual percentage rate in accordance with the actuarial method are set forth in appendix J to this regulation.[45d]

(2) As a general rule, the annual percentage rate shall be considered accurate if it is not more than 1/8 of 1 percentage point above or below the annual percentage rate determined in accordance with paragraph (a)(1) of this section.

(3) In an irregular transaction, the annual percentage rate shall be considered accurate if it is not more than 1/4 of 1 percentage point above or below the annual percentage rate determined in accordance with paragraph (a)(1) of this section.[46]

(4) *Mortgage loans.* If the annual percentage rate disclosed in a transaction secured by real property or a dwelling varies from the actual rate determined in accordance with paragraph (a)(1) of this section, in addition to the tolerances applicable under paragraphs (a)(2) and (3) of this section, the disclosed annual percentage rate shall also be considered accurate if:

(i)  The rate results from the disclosed finance charge; and

(ii)(A)  The disclosed finance charge would be considered accurate under § 226.18(d)(1); or

(B)  For purposes of rescission, if the disclosed finance charge would be considered accurate under § 226.23(g) or (h), whichever applies.

(5) *Additional tolerance for mortgage loans.* In a transaction secured by real property or a dwelling, in addition to the tolerances applicable under paragraphs (a)(2) and (3) of this section, if the disclosed finance charge is calculated incorrectly but is considered accurate under § 226.18(d)(1) or § 226.23(g) or (h), the disclosed annual percentage rate shall be considered accurate:

(i)  If the disclosed finance charge is understated, and the disclosed annual percentage rate is also understated but it is closer to the actual annual percentage rate than the rate that would be considered accurate under paragraph (a)(4) of this section;

(ii)  If the disclosed finance charge is overstated, and the disclosed annual percentage rate is also overstated but it is closer to the actual annual percentage rate than the rate that would be considered accurate under paragraph (a)(4) of this section.

(b) *Computation tools.* (1) The Regulation Z Annual Percentage Rate Tables produced by the Board may be used to determine the annual percentage rate, and any rate determined from those tables in accordance with the accompanying instructions complies with the requirements of this section. Volume I of the tables applies to single advance transactions involving up to 480 monthly payments or 104 weekly payments. It may be used for regular transactions and for transactions with any of the following irregularities: an irregular first period, an irregular first payment, and an irregular final payment. Volume II of the tables applies to transactions involving multiple advances and any type of payment or period

irregularity.

(2) Creditors may use any other computation tool in determining the annual percentage rate if the rate so determined equals the rate determined in accordance with appendix J, within the degree of accuracy set forth in paragraph (a) of this section.

(c) *Single add-on rate transactions.* If a single add-on rate is applied to all transactions with maturities up to 60 months and if all payments are equal in amount and period, a single annual percentage rate may be disclosed for all those transactions, so long as it is the highest annual percentage rate for any such transaction.

(d) *Certain transactions involving ranges of balances.* For purposes of disclosing the annual percentage rate referred to in § 226.17(g)(4) (Mail or telephone orders--delay in disclosures) and (h) (Series of sales--delay in disclosures), if the same finance charge is imposed on all balances within a specified range of balances, the annual percentage rate computed for the median balance may be disclosed for all the balances. However, if the annual percentage rate computed for the median balance understates the annual percentage rate computed for the lowest balance by more than 8 percent of the latter rate, the annual percentage rate shall be computed on whatever lower balance will produce an annual percentage rate that does not result in an understatement of more than 8 percent of the rate determined on the lowest balance.

*[46 FR 20892, Apr. 7, 1981, as amended at 47 FR 756, Jan. 7, 1982; 48 FR 14886, Apr. 6, 1983; 61 FR 49246, Sept. 19, 1996]*

**Variable Rate Loans**

Variable-Rate Loans (§ 226.18(f))

If the terms of the legal obligation allow the financial institution, after consummation of the transaction, to increase the APR, the financial institution must furnish the consumer with certain information on variable rates. Graduated-payment mortgages and step-rate transactions without a variable-rate feature are not considered variable-rate transactions. In addition, variable-rate disclosures are not applicable to rate increases resulting from delinquency, default, assumption, acceleration, or transfer of the collateral. Some of the more important transaction-
specific variable-rate disclosure requirements under section 226.18 follow:

- Disclosures for variable-rate loans must cover the full term of the transaction and must be based on the terms in effect at the time of consummation.
- If the variable-rate transaction includes either a seller buydown that is reflected in a contract or a consumer buydown, the disclosed APR should be a composite rate based on the lower rate for the buydown period and the rate that is the basis for the variable-rate feature for the remainder of the term.
- If the initial rate is not determined by the index or formula used to make later interest rate adjustments, as in a discounted variable-rate transaction, the disclosed APR must reflect a composite rate based on the initial rate for as long as it is applied and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation (that is, the fully indexed rate).
  – If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the adjustment, from changing to the fully indexed rate, the effect of that rate or payment cap

needs to be reflected in the disclosure.
- The index at consummation need not be used if the contract provides for a delay in imple-mentation of changes in an index value (for example, the contract indicates that future rate changes are based on the index value in effect for some specified period, such as forty-five days before the change date). Instead, the financial institution may use any rate from the date of consummation back to the beginning of the specified period (for example, during the previous forty-five-day period).
- If the initial interest rate is set according to the index or formula used for later adjustments but is set at a value as of a date before consummation, disclosures should be based on the initial interest rate, even though the index may have changed by the consummation date.

For variable-rate consumer loans that are *not* secured by the consumer's principal dwelling or that are secured by the consumer's principal dwelling but have a term of one year or less, creditors must disclose the circumstances under which the rate may increase, any limitations on the increase, the effect of an increase, and an example of the payment terms that would result from an increase (section 226.18(f)(1)).

For variable-rate consumer loans that *are* secured by the consumer's principal dwelling and have a maturity of more than one year, creditors must state that the loan has a variable-rate feature and that disclosures were previously given (section 226.18(f)(2)). Extensive disclosures about the loan program must be provided when consumers apply for such a loan (section 226.19(b)) and throughout the loan term when the rate or payment amount is changed (section 226.20(c)).

**Special Rules for Certain Home Mortgage Transactions**

**Source:** Reg. Z, 60 FR 15471, Mar. 24, 1995, unless otherwise noted.

**§ 226.31   General rules.**

(a) *Relation to other subparts in this part.* The requirements and limitations of this subpart are in addition to and not in lieu of those contained in other subparts of this part.

(b) *Form of disclosures*—(1) *General.* The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.

(2) *Electronic communication.* For rules governing the electronic delivery of disclosures, including a definition of electronic communication, see §226.36.

(c) *Timing of disclosure*—(1) *Disclosures for certain closed-end home mortgages.* The creditor shall furnish the disclosures required by §226.32 at least three business days prior to consummation of a mortgage transaction covered by §226.32.

(i) *Change in terms.* After complying with paragraph (c)(1) of this section and prior to consummation, if the creditor changes any term that makes the disclosures inaccurate, new disclosures shall be provided in accordance with the requirements of this subpart.

(ii) *Telephone disclosures.* A creditor may provide new disclosures by telephone if the consumer initiates the change and if, at consummation:

(A) The creditor provides new written disclosures; and

(B) The consumer and creditor sign a statement that the new disclosures were provided by telephone at least three days prior to consummation.

(iii) *Consumer's waiver of waiting period before consummation.* The consumer may, after receiving the disclosures required by paragraph (c)(1) of this section, modify or waive the three-day waiting period between delivery of those disclosures and consummation if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the waiting period, and bears the signature of all the consumers entitled to the waiting period. Printed forms for this purpose are prohibited, except when creditors are permitted to use printed forms pursuant to §226.23(e)(2).

(2) *Disclosures for reverse mortgages.* The creditor shall furnish the disclosures required by §226.33 at least three business days prior to:

(i) Consummation of a closed-end credit transaction; or

(ii) The first transaction under an open-end credit plan.

(d) *Basis of disclosures and use of estimates*—(1) *Legal Obligation.* Disclosures shall reflect the terms of the legal obligation between the parties.

(2) *Estimates.* If any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided, and shall state clearly that the disclosure is an estimate.

(3) *Per-diem interest.* For a transaction in which a portion of the interest is determined on a per-diem basis and collected at consummation, any disclosure affected by the per-diem interest shall be considered accurate if the disclosure is based on the information known to the creditor at the time that the disclosure documents are prepared.

(e) *Multiple creditors; multiple consumers.* If a transaction involves more than one creditor, only one set of disclosures shall be given and the creditors shall agree among themselves which creditor must comply with the requirements that this part imposes on any or all of them. If there is more than one consumer, the disclosures may be made to any consumer who is primarily liable on the obligation. If the transaction is rescindable under §226.15 or §226.23, however, the disclosures shall be made to each consumer who has the right to rescind.

(f) *Effect of subsequent events.* If a disclosure becomes inaccurate because of an event that occurs after the creditor delivers the required disclosures, the inaccuracy is not a violation of Regulation Z (12 CFR part 226), although new disclosures may be required for mortgages covered by §226.32 under paragraph (c) of this section, §226.9(c), §226.19, or §226.20.

(g) *Accuracy of annual percentage rate.* For purposes of §226.32, the annual percentage rate shall be considered accurate, and may be used in determining whether a transaction is covered by §226.32, if it is accurate according to the requirements and within the tolerances under §226.22. The finance charge tolerances for rescission under §226.23(g) or (h) shall not apply for this purpose.

[Reg. Z, 60 FR 15471, Mar. 24, 1995, as amended at 60 FR 29969, June 7, 1995; 61 FR 49247, Sept. 19, 1996; 66 FR 17339, Mar. 30, 2001]

**Truth In Lending Law: Regulation B**

**§ 202.9  Notifications.**

(a)  *Notification of action taken, ECOA notice, and statement of specific reasons--* (1)  *When notification is required.*  A creditor shall notify an applicant of action taken within:

(i)  30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application;

(ii)  30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section;

(iii)  30 days after taking adverse action on an existing account; or

(iv)  90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered.

(2)  *Content of notification when adverse action is taken.*  A notification given to an applicant when adverse action is taken shall be in writing and shall contain a statement of the action taken; the name and address of the creditor; a statement of the provisions of § 701(a) of the Act; the name and address of the federal agency that administers compliance with respect to the creditor; and either:

(i)  A statement of specific reasons for the action taken; or

(ii)  A disclosure of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification. The disclosure shall include the name, address, and telephone number of the person or office from which the statement of reasons can be obtained. If the creditor chooses to provide the reasons orally, the creditor shall also disclose the applicant's right to have them confirmed in writing within 30 days of receiving the applicant's written request for confirmation.

(3)  *Notification to business credit applicants.* For business credit, a creditor shall comply with the notification requirements of this section in the following manner:

(i)  With regard to a business that had gross revenues of $1 million or less in its preceding fiscal year (other than an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit), a creditor shall comply with paragraphs (a)(1) and (2) of this section, except that:

(A)  The statement of the action taken may be given orally or in writing, when adverse action is taken;

(B)  Disclosure of an applicant's right to a statement of reasons may be given at the time of application, instead of when adverse action is taken, provided the disclosure contains the information required by paragraph (a)(2)(ii) of this section; and the ECOA notice specified in paragraph (b)(1) of this section;

(C)  For an application made entirely by telephone, a creditor satisfies the requirements of paragraph (a)(3)(i) of this section by an oral statement of the action taken and of the applicant's right to a statement of reasons for adverse action.

(ii)  With regard to a business that had gross revenues in excess of $1 million in its preceding fiscal year

or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit, a creditor shall:

(A)  Notify the applicant, within a reasonable time, orally or in writing, of the action taken; and

(B)  Provide a written statement of the reasons for adverse action and the ECOA notice specified in paragraph (b)(1) of this section if the applicant makes a written request for the reasons within 60 days of the creditor's notification.

(b)  *Form of ECOA notice and statement of specific reasons--(1)  ECOA notice.*  To satisfy the disclosure requirements of paragraph (a)(2) of this section regarding section 701(a) of the Act, the creditor shall provide a notice that is substantially similar to the following:

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is [name and address as specified by the appropriate agency listed in appendix A of this regulation].

(2)  *Statement of specific reasons.*  The statement of reasons for adverse action required by paragraph (a)(2)(i) of this section must be specific and indicate the principal reason(s) for the adverse action. Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant, joint applicant, or similar party failed to achieve the qualifying score on the creditor's credit scoring system are insufficient.

(c)  *Incomplete applications--(1)  Notice alternatives.*  Within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either:

(i)  Of action taken, in accordance with paragraph (a) of this section; or

(ii)  Of the incompleteness, in accordance with paragraph (c)(2) of this section.

(2)  *Notice of incompleteness.*  If additional information is needed from an applicant, the creditor shall send a written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application. The creditor shall have no further obligation under this section if the applicant fails to respond within the designated time period. If the applicant supplies the requested information within the designated time period, the creditor shall take action on the application and notify the applicant in accordance with paragraph (a) of this section.

(3)  *Oral request for information.*  At its option, a creditor may inform the applicant orally of the need for additional information. If the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section.

(d)  *Oral notifications by small-volume creditors.*  In the case of a creditor that did not receive more than 150 applications during the preceding calendar year, the requirements of this section (including statements of specific reasons) are satisfied by oral notifications.

(e)  *Withdrawal of approved application.*  When an applicant submits an application and the parties contemplate that the applicant will inquire about its status, if the creditor approves the application and

the applicant has not inquired within 30 days after applying, the creditor may treat the application as withdrawn and need not comply with paragraph (a)(1) of this section.

(f)  *Multiple applicants.*  When an application involves more than one applicant, notification need only be given to one of them, but must be given to the primary applicant where one is readily apparent.

(g)  *Applications submitted through a third party.*  When an application is made on behalf of an applicant to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification of action taken by any of the other creditors is not required. If no credit is offered or if the applicant does not expressly accept or use any credit offered, each creditor taking adverse action must comply with this section, directly or through a third party. A notice given by a third party shall disclose the identity of each creditor on whose behalf the notice is given.

*[Codified to 12 C.F.R. § 202.9]*

*[Section 202.9 amended at 68 Fed. Reg. 13161, March 18, 2003; 72 Fed. Reg. 63451, November 9, 2007, effective January 1, 2008, the mandatory compliance date is November 1, 2008]*

Credit Score Information

"The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change."

"If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer-reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application."

**Fair Credit Reporting Act**

(E) Actions not required under this subsection. This subsection shall not require any person to–

(i) explain the information provided pursuant to subsection (f);

(ii) disclose any information other than a credit score or key factors, as defined in subsection (f);

(iii) disclose any credit score or related information obtained by the user after a loan has closed;

(iv) provide more than 1 disclosure per loan transaction; or

(v) provide the disclosure required by this subsection when another person has made the disclosure to

the consumer for that loan transaction.

(F) No Obligation for Content

(i) In general. The obligation of any person pursuant to this subsection shall be limited solely to providing a copy of the information that was received from the consumer reporting agency.

(ii) Limit on liability. No person has liability under this subsection for the content of that information or for the omission of any information within the report provided by the consumer reporting agency.

(G) Person defined as excluding enterprise. As used in this subsection, the term "person" does not include an enterprise (as defined in paragraph (6) of section 1303 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992).

(2) Prohibition on Disclosure Clauses Null and Void

(A) In general. Any provision in a contract that prohibits the disclosure of a credit score by a person who makes or arranges loans or a consumer reporting agency is void.

(B) No liability for disclosure under this subsection- A lender shall not have liability under any contractual provision for disclosure of a credit score pursuant to this subsection.

(G) Person defined as excluding enterprise. As used in this subsection, the term "person" does not include an enterprise (as defined in paragraph (6) of section 1303 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992).

(2) Prohibition on Disclosure Clauses Null and Void

(A) In general. Any provision in a contract that prohibits the disclosure of a credit score by a person who makes or arranges loans or a consumer reporting agency is void.

(B) No liability for disclosure under this subsection- A lender shall not have liability under any contractual provision for disclosure of a credit score pursuant to this subsection.

**The Gramm-Leach-Bliley Act**
**Privacy of Consumer Financial Information**

**A. Consumers**

*Definition*: A "consumer" is an individual who obtains or has obtained a financial product or service from a financial institution that is to be used primarily for personal, family, or household purposes, or that individual's legal representative.

**Examples of Consumer Relationships:**

- Applying for a loan
- Obtaining cash from a foreign ATM, even if it occurs on a regular basis
- Cashing a check with a check-cashing company
- Arranging for a wire transfer

**General Obligations to Consumers:**

- Provide an initial (or "short-form") notice about the availability of the privacy policy if the financial institution shares information outside the permitted exceptions.
- Provide an opt-out notice, with the initial notice or separately, prior to a financial institution sharing nonpublic personal information with nonaffiliated third parties.
- Provide consumers with a "reasonable opportunity" to opt out before disclosing nonpublic personal information about them to nonaffiliated third parties, such as 30 days from the date the notice is mailed.
- If a consumer elects to opt out of all or certain disclosures, a financial institution must honor that opt-out direction as soon as is reasonably practicable after the opt-out is received.
- If you change your privacy practices such that the most recent privacy notice you provided to a consumer is no longer accurate (e.g., you disclose a new category of NPI to a new nonaffiliated third party outside of specific exceptions and those changes are not adequately described in your prior notice), you must provide new revised privacy and opt-out notices.